# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| Robin Szynski, | Case No. |
| AND | |
| Brent Szynski, | **COMPLAINT FOR DAMAGES UNDER THE FAIR DEBT COLLECTION PRACTICES ACT, THE INDIANA DECEPTIVE CONSUMER SALES ACT AND OTHER EQUITABLE RELIEF** |
| Plaintiffs, | |
| v. | |
| Stenger & Stenger, P.C., | |
| Defendant. | **JURY TRIAL DEMANDED** |

## PARTIES

1. Plaintiff, Robin Szynski ("Robin"), is a natural person who resided in Granger, Indiana, at all times relevant to this action.

2. Plaintiff, Brent Szynski ("Brent"), is a natural person who resided in Granger, Indiana, at all times relevant to this action.

3. Defendant, Stenger & Stenger, P.C. ("Stenger"), is a Michigan professional corporation that maintained its principal place of business in Grand Rapids, Michigan, at all times relevant to this action.

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction over this matter as it arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

5. Pursuant to 28 U.S.C. §1367(a), the Court also has Supplemental Jurisdiction over Plaintiffs' claims under the Indiana Deceptive Consumer Sales Act, I.C. 24-5-0.5 et seq. ("IDCSA"),

because they share a common nucleus of operative fact with Plaintiffs' claims under the FDCPA.

6.  Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

7.  At all times relevant to this action, Stenger collected consumer debts.

8.  Stenger regularly uses instrumentalities of interstate commerce and the mails to collect consumer debts owed or due or asserted to be owed or due another.

9.  Stenger is a "debt collector" that regularly collects consumer debts as defined by 15 U.S.C. §1692a(6).

10. Stenger is a "supplier" as defined by § 24-5-0.5-2(a)(3) of the IDCSA.

11. As described, *infra*, Stenger contacted Robin and Brent to collect a debt that was incurred primarily for personal, family, or household purposes.

12. This alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5).

13. Robin and Brent are "consumers" as defined by 15 U.S.C. § 1692a(3).

14. Several years ago, Robin and Brent were forced to file Bankruptcy due to an extreme financial hardship that required they fall behind on their financial obligations.

15. Around the time of the Bankruptcy filing, Stenger filed a lawsuit against Robin and Brent on a debt unrelated to this lawsuit.  However, Robin and Brent's experience dealing with Stenger's litigation was horrid.

16. Robin and Brent were thrilled to have received their Bankruptcy Discharge and were excited to begin their "fresh start".

17. Tragically, after Robin and Brent received their Bankruptcy Discharge, Robin and Brent's financial situation worsened as Robin became permanently and totally disabled.

18. As such, Robin's sole income is from Social Security Disability.

19. Because of Robin's condition, Robin and Brent once again fell behind on their financial obligations.

20. Five of the accounts that Robin and Brent fell behind on were purchased by an infamous debt purchaser ("Midland").

21. All five of the accounts were unique and unrelated.

22. Out of the five accounts Midland purchased, Midland forwarded three unrelated accounts to Stenger to assist with collection activity.

23. Stenger began communicating with Robin and Brent in connection with the collection of the three individual accounts and demanded three payments.

24. Stenger mailed three unique letters related to the three unique debts to Robin and Brent.

25. Unfortunately, these three unique letters were mailed to an incorrect address and were not received by Robin and Brent for weeks after they were apparently mailed.

26. None of these letters were received by Robin or Brent within 35 days of their initial communication with Stenger.

27. In fact, the only reason the three unique letters were received by Robin and Brent was because their mail carrier recognized Robin and Brent's name and, being aware of their correct address, was kind enough to hand deliver them to Robin and Brent.

28. Each of the three unique letters demanding payment on the three individual accounts invited Robin and Brent to mail an individual check to resolve each individual debt.

29. Having received the letters weeks late, Robin began to panic as based on her prior experience with Stenger, she believed Stenger was likely preparing to file three individual lawsuits against her and/or Brent.

30. As such, upon receiving the letters, Robin immediately reached out to Stenger to resolve some, or all of the debts as Stenger offered in their individual letters.

31. Robin made several settlement offers on two of the accounts all of which Stenger unilaterally rejected.

32. In rejecting Robin's settlement offers, without speaking to Stenger's client, Midland, Stenger told her that, Midland, refused to accept any payment on any of the individual accounts unless Robin agreed to satisfy all three.

33. Stenger's statements were patently untrue, evidenced in part by Stenger's prior individual invitations to Robin and Brent to satisfy an individual account.

34. On information and belief, Midland did not inform Stenger that it was unwilling to accept payment in full on any of the three accounts unless Robin and Brent agreed to make payment on all.

35. In an effort to force Robin and Brent to satisfy all three accounts, Stenger offered a lump sum settlement offer for the combined amount of the alleged debts, less 10%.

36. In response, Robin explained that she was disabled, that her only income was from Social Security Disability Insurance and that she was "Judgment Proof".

37. Additionally, Robin explained that she didn't have the funds to satisfy all three accounts as her only available funds would be from cashing out/cancelling Brent's life insurance policy.

38. As Robin continued to plead for individual settlements, Stenger reiterated that Robin was unable to pay any of the accounts individually and the 10% discount offer only stood if Robin accepted the offer for all.

39. Dismayed, Robin attempted to verify that Stenger was refusing to present her offers to Midland and that Stenger even wouldn't accept payment in full on two of the accounts without Robin agreeing to pay the third.

40. Robin spent considerable time with Stenger on the telephone pleading with Stenger to simply present her offer to settle two of the accounts.

41. To coerce Robin and Brent into accepting this offer, Stenger falsely told Robin something substantially similar to, "You should take the 10% discount, it is the most I have *ever* seen Midland offer".

42. On information and belief, Stenger has frequently witnessed Midland offer more than a 10% discount on a file placed with Stenger.

43. Moreover, later in the conversation, Stenger offered Robin a more than 10% discount on the accounts if she agreed to satisfy them all.

44. On information and belief, Midland was willing to accept a settlement offer on one of the accounts, even if Robin was unable to satisfy them all.

45.  In fact, to support her belief that Stenger was not discussing her offers with Midland and that Midland, in fact, didn't have a "settle all or no position", Robin telephoned Midland directly.

46. In this telephone call, Robin settled two of her five Midland accounts for $1,000.

47. Her $1,000 settlement was more than a 10% reduction of the reported balances.  In fact, it constituted a 60% reduction.

5

48. Stenger's collection efforts and conduct caused Robin and Brent to lose their opportunity to dispute the debt and request validation provided under Federal Law.

49. Stenger's collection efforts and conduct caused Robin and Brent to continue to have three unpaid accounts within their office.

50. But for Stenger's collection tactics, Robin and Brent would have been able to satisfy two of the three accounts.

51. Because of Stenger's collection tactics, both Robin and Brent have more unpaid debt than they would have if Stenger didn't violate the FDCPA.

52. Stenger's collection tactics have negatively impacted Robin's health and wellness and has worsened the issues that led to her receiving social security.

53. Stenger's collection efforts, including, but not limited to its telephone calls, caused Robin and Brent emotional distress in the form of frustration, annoyance, aggravation, and anxiety.

54. Stenger's collection efforts also intruded upon Robin and Brent's privacy and has led to the loss of consortium.

## <u>COUNT ONE</u>

### Violation of the Fair Debt Collection Practices Act

55. Plaintiffs re-allege and incorporate by reference Paragraphs 7 through 54 above as if fully set forth herein.

56. In order to establish a violation of Section 1692d of the FDCPA, a consumer need not prove intentional conduct by the debt collector.  *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir.

2013) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

57. "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

58. The likely effect of Defendant's debt collection efforts, as measured by the "least sophisticated consumer" standard, was "to harass, oppress, or abuse" Plaintiffs.

59. Defendant violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Plaintiffs in connection with the collection of the debt.

## COUNT TWO

### Violation of the Fair Debt Collection Practices Act

60. Plaintiffs re-allege and incorporate by reference Paragraphs 7 through 54 above as if fully set forth herein.

61. Defendant violated 15 U.S.C. § 1692e by using false, deceptive, or misleading representations or means in connection with the collection of the debt.

## COUNT THREE

### Violation of the Fair Debt Collection Practices Act

62. Plaintiffs re-allege and incorporate by reference Paragraphs 7 through 54 above as if fully set forth herein.

63. Defendant violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## <u>COUNT FOUR</u>

### **Violation of the Fair Debt Collection Practices Act**

64. Plaintiffs re-allege and incorporate by reference Paragraphs 7 through 54 above as if fully set forth herein.

65. Defendant violated 15 U.S.C. §1692g by failing to send Plaintiffs the required notice to a legitimate address within five days of Defendant's initial communication with Plaintiffs.

## <u>COUNT FIVE</u>

### **Violation of the Indiana Deceptive Consumer Sales Act**

66. Plaintiffs re-allege and incorporate by reference Paragraphs 7 through 54 above as if fully set forth herein.

67. The IDCSA states, in relevant part:

> "A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." I.C. § 24-5-0.5-3(a).

> "Without limiting the scope of subsection (a), the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier are deceptive acts: The violation by a supplier of the federal Fair Debt Collection Practices Act (15 U.S.C. 1692 et seq.), including any rules or regulations issued under the federal Fair Debt Collection Practices Act (15 U.S.C. 1692 et seq.)." I.C. § 24-5-0.5-3(b)(20).

> "A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (1) three (3) times the actual damages of the consumer suffering the loss; or (2) one thousand dollars ($1,000)." I.C. § 24-5-0.5-4(a)(1)(2).

68. Defendant's collection activity in connection with the Subject Debt is a "consumer transaction" as that term is defined by the IDCSA at I.C. § 24-5-0.5-2(a)(1)(C).

69. Defendant engaged in unfair, abusive, and deceptive conduct in its transactions with Plaintiffs, in violation of I.C. §§ 24-5-0.5-3(20), violating the FDCPA.

70. Defendant intended that Plaintiffs rely on its unlawful communications in order to procure immediate payment of the debt and/or prevent Plaintiffs from exercising his rights. As such, Defendant committed a "willful deceptive act" as that term is used and/or contemplated within the IDCSA.

71. Plaintiffs have been harmed and has suffered damages as a result of Defendant's unlawful collection practices as described herein.

72. Plaintiffs are therefore entitled to relief pursuant to I.C. § 24-5-0.5-4(a)(1)(2).

## JURY DEMAND

73. Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

74. Plaintiffs pray for the following relief:

   a. Judgment against Defendant, in favor of each Plaintiff, for actual damages, statutory damages, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k.

   b. Judgment against Defendant, in favor of each Plaintiff, for statutory damages as provided under I.C. § 24-5-0.5-4(a)(1)(2).

   c. For such other legal and/or equitable relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,


Date:   February 17, 2023

By: /s/ Jeffrey S. Hyslip
Jeffrey S. Hyslip, Esq.
Hyslip Legal, LLC
207 S. Harrison Street, Suite A
Algonquin, IL 60102
Phone: 614-362-3322
Email: jeffrey@hysliplegal.com

*Attorney for Plaintiffs*